IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION

| | |
|---|---|
| ROBERT ADELL BROWN,<br><br>Plaintiff,<br><br>vs.<br><br>RANDY GORMAN,<br><br>Defendants. | Cause No. CV 07-0026-BLG-RFC-CSO<br><br>FINDINGS AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE TO GRANT DEFENDANT GORMAN'S MOTION FOR SUMMARY JUDGMENT |

Plaintiff Robert Adell Brown ("Brown") brings this action to recover damages for an alleged equal protection violation arising out of a traffic stop. Defendant Randy Gorman filed a Motion for Summary Judgment. (Court's Doc. No. 38). Brown's resists the motion.[1]

---

[1] As Gorman correctly argues, Brown's response was untimely. There is a strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. See Eitel v. McCool, 782 F.2d 1470, 1471-72 (9th Cir. 1986)(regarding default judgments); DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 185-6 (9th Cir. 1987)(regarding granting leave to amend under Rule 15); Pagtalunan v. Galaza, 291 F.3d 639 (9th Cir. 2002)(Fed.R.Civ.P. 41(b) dismissals); Eldridge v. Block, 832 F.2d 1132, 1137 (9th Cir. 1987)(policy favoring resolution on the merits "is particularly important in civil rights cases."). In light of this policy and the lack of prejudice to Defendant Gorman, the Court will consider Brown's response.

I.  SUMMARY JUDGMENT STANDARD

Parties are entitled to summary judgment if they can demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  That is, where the documentary evidence permits only one conclusion.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986).

The party seeking summary judgment bears the initial burden of informing the Court of the basis of its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, it believes demonstrate the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Where the moving party has met its initial burden with a properly supported motion, the party opposing the motion "may not rest upon the mere allegations or denials of his pleading, but  . . .  must set forth specific facts showing that there is a genuine issue for trial."  Anderson, 477 U.S. at 248.  The non-moving party may do this by use of

affidavits (including his own), depositions, answers to interrogatories, and admissions.  Id.  Only disputes over facts that might affect the outcome of the suit under the governing law are "material" and will properly preclude entry of summary judgment.  Id.

At the summary judgment stage, the judge's function is not to weigh the evidence or determine the truth of the matter, but to determine whether there is a genuine issue for trial.  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249-50.

> The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party].  The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict.

Anderson, 477 U.S. at 252.

In civil rights cases and in the context of a motion for summary judgment where a litigant is proceeding pro se, the court has an obligation to construe pro se documents liberally and to afford the pro se litigant the benefit of any doubt.  Erickson v. Pardus, 551 U.S. 89,

127 S.Ct 2197, 2200 (2007) (per curiam); Baker v. McNeil Island Corrections Ctr., 859 F.2d 124, 127 (9th Cir. 1988).

## II.   STATEMENT OF RELEVANT FACTS

Defendant, C.R. (Randy) Gorman, was employed as a Trooper, with the Montana Department of Justice, Highway Patrol Division, from April 8, 1985, through the date of his retirement on July 21, 2006. (Court's Doc. No. 43:  Defendant's Facts ¶1, citing Court's Doc. No. 42: Gorman Affidavit ¶ 4).

Gorman was assigned to the Wibaux Station in Wibaux, Montana, from 1999 until his retirement.  (Court's Doc. No. 43:  Defendant's Facts ¶6, citing Court's Doc. No. 42:  Gorman Affidavit, ¶ 4).  On April 22, 2006, Gorman worked the 2:00 p.m. to 11:00 p.m. shift.  (Court's Doc. No. 43:  Defendant's Facts ¶10, citing Court's Doc. No. 42: Gorman Affidavit, ¶ 10).

Gorman wrote two citations for speeding on April 22, 2006.  One to Brown, for traveling 87 m.p.h. in a 75 m.p.h. zone, and the other to John Kacewicz, for traveling 84 m.p.h. in a 75 m.p.h. zone.  (Court's Doc. No. 43:  Defendant's Facts ¶11, citing Court's Doc. No. 42:

Gorman Affidavit ¶¶ 11, 46).

On April 22, 2006, Gorman's radar instrument was mounted on the left-hand side of his patrol car.  When Gorman was moving, the radar unit had the capability of scanning targets coming toward the patrol car, approaching from behind the patrol car, and traveling in front of the patrol car.  However, 95% to 99% of the time, Gorman radared vehicles coming toward him because he could drive more safely that way, and because he was more familiar and comfortable radaring vehicles coming toward him. (Court's Doc. No. 43:  Defendant's Facts ¶15, citing Court's Doc. No. 42:  Gorman Affidavit ¶15).

When patrolling, Gorman routinely estimated the speed of a vehicle coming toward him when it was approximately one-half to one-quarter of a mile away from him, depending on the conditions.  If Gorman observed through his training and experience that the vehicle was speeding, he would activate the radar transmitter to verify what he had observed as speeding.  He would read the vehicle's speed on the radar screen for approximately two to three seconds.  If the radar verified his observation that the vehicle was speeding, he would "lock

in" the speed on the radar instrument.  Gorman would then watch the vehicle pass him to obtain the vehicle's description in order to follow it and pull it over.  When Gorman locked in the speed on the radar, it would stay visible on the radar screen for approximately 15 minutes, and then the screen would go blank.  (Court's Doc. No. 43:  Defendant's Facts ¶18, citing Court's Doc. No. 42:  Gorman Affidavit ¶20).

When a target vehicle passed Gorman on the other side of the median, Gorman routinely focused primarily on the vehicle's color and general description, i.e., passenger car, van or truck, in order to pursue the targeted vehicle.  Gorman would also routinely attempt to see the number of occupants in the vehicle, and, depending on the weather conditions and the sun's reflection on the vehicle's window, Gorman might be able to see a gender profile of the driver. (Court's Doc. No. 43:  Defendant's Facts ¶19, citing Court's Doc. No. 42:  Gorman Affidavit ¶21).

As is recorded in his Daily Log for April 22, 2006, at the start of his shift at 1359 on April 22, 2006, Gorman inserted a blank videotape in the video camera in his patrol car, and he verified the radar.  As was

his routine, Gorman patrolled in the left (inside) lane of I-94, going westbound, at approximately 65 m.p.h.  At that time, there was no traffic visible in front of Gorman, going westbound.  There may have been someone traveling behind Gorman but he did not notice because most of his attention was focused through the front windshield.  In any case, there were no vehicles approaching him rapidly from behind. (Court's Doc. No. 43:  Defendant's Facts ¶20, citing Court's Doc. No. 42: Gorman Affidavit ¶22).

Within a few minutes after entering I-94, at approximately 2:20 p.m., Gorman saw a vehicle, later identified as Brown's vehicle, coming down the hill, going eastbound, that appeared to be speeding.  The posted speed limit was 75 m.p.h.  Brown's vehicle was in the right (outside) lane.  Gorman could see the eastbound traffic coming down the hill from quite a distance.  (Court's Doc. No. 43:  Defendant's Facts ¶21, citing Court's Doc. No. 42:  Gorman Affidavit ¶23).

The closest vehicles to Brown's vehicle was a mini-van behind Brown and a semi-truck behind the mini-van.  Neither vehicle was close to Brown.  (Court's Doc. No. 43:  Defendant's Facts ¶22, citing

Court's Doc. No. 42:  Gorman Affidavit ¶24).

When Gorman began observing it and estimating its speed, Brown's vehicle was about one-half mile away from Gorman, and was coming down a hill.  Gorman estimated from his observation, training, and experience that Brown was traveling at a speed of 85 m.p.h. (Court's Doc. No. 43:  Defendant's Facts ¶23, citing Court's Doc. No. 42: Gorman Affidavit ¶25).

Gorman also estimated the speeds of the mini-van and the semi-truck.  He does not recall the specific estimated speeds, but recalls their estimated speeds were less than nine miles per hour over the posted speed limit.  Brown's vehicle was ahead of and going faster than the other two vehicles.  (Court's Doc. No. 43:  Defendant's Facts ¶24, citing Court's Doc. No. 42:  Gorman Affidavit ¶26).

Brown did not pay any attention to the mini-van and the semi-truck going eastbound, and he does not know the race of the drivers of those vehicles.  (Court's Doc. No. 43:  Defendant's Facts, ¶25 citing Court's Doc. No. 43-1, p. 8:  Brown Depo, depo page 40:18-21).

In order to verify what Gorman had observed as speeding on the

part of the target vehicle, Gorman activated the radar transmitter

when Brown was about 1/4 of a mile away from him, at approximately

mile marker 238, and Gorman locked in the speed on the radar screen.

The radar screen showed Brown traveling at 87 m.p.h.  Gorman

decided to stop Brown as soon as the radar verified his observation that

the vehicle was speeding at 87 m.p.h.  When Brown passed Gorman, he

noted the type and color of the vehicle in order to be able to follow it

and stop it.  That was Gorman's usual procedure.  (Court's Doc. No. 43:

Defendant's Facts ¶26, citing Court's Doc. No. 42:  Gorman Affidavit ¶

27).

     Gorman could not make out Brown's features nor determine his

race from a distance of a half a mile when he began estimating the

vehicle's speed.  That was because Brown was too far away, the sun

was reflecting off of Gorman and Brown's vehicle's windshields, and

because Gorman wears glasses, which increases the windshield's

reflections. (Court's Doc. No. 43:  Defendant's Facts ¶27, citing Court's

Doc. No. 42:  Gorman Affidavit ¶28).

     At the time he observed Brown's vehicle traveling over the posted

speed limit, Gorman did not know Brown, Gorman did not know the driver of the vehicle was Brown, and Gorman did not know what Brown's vehicle looked like. (Court's Doc. No. 43: Defendant's Facts ¶28, citing Court's Doc. No. 42: Gorman Affidavit ¶29).

Troopers in moving vehicles must process many things in a brief period of time as they are preparing to enter the median to safely pursue a vehicle. These include identifying the target vehicle's color and general description in order to pursue it; checking the mirrors to see if any vehicle is close behind the Trooper because of the sudden change in speed and movement the Trooper must make as he goes into the median; checking the condition of the median for culverts, signs, steepness of grade, etc., in order to enter the median at a safe location; slowing down the patrol car to enter the median; checking the location of vehicles in the area of the target vehicle so that the Trooper's sudden movement entering the median does not startle them into suddenly braking and causing an accident. Gorman was processing all of these things as the target vehicle passed him on April 22, 2006, and he prepared to pursue it. (Court's Doc. No. 43: Defendant's Facts ¶29,

citing Court's Doc. No. 42:  Gorman Affidavit ¶ 30).

Typically, there is only a brief amount of time to view the target vehicle, and the driver, when the vehicle is passing the Trooper.  Feet per second is calculated by multiplying miles per hour by 1.46.  In this case, Brown was traveling at 87 m.p.h., which is 127 feet per second. Gorman was traveling at 65 m.p.h., which is 95 feet per second.  If the two are added together, the target vehicle and Gorman's patrol car were traveling at 222 feet per second when they passed each other. (Court's Doc. No. 43:  Defendant's Facts ¶30, citing Court's Doc. No. 42: Gorman Affidavit ¶31).

Gorman first saw the vehicle was a gold color older-model Oldsmobile sedan and that there was one person in the vehicle when Brown passed him.  Gorman saw a silhouette.  Gorman was pretty sure it was a man.  Gorman does not recall if the person he saw in the target vehicle was African American. Gorman was not paying attention to determining the race of the driver.  Gorman did not know at that time that the target vehicle belonged to Brown.  (Court's Doc. No. 43: Defendant's Facts ¶32, citing Court's Doc. No. 42:  Gorman Affidavit,

Gorman, ¶¶29, 33).

After Brown passed, Gorman crossed the median on I-94 in order to travel eastbound (there was not a cut-out in that area), turned on his flashing lights which automatically activated the video camera, and pursued the vehicle.  (Court's Doc. No. 43:  Defendant's Facts ¶34, citing Court's Doc. No. 42:  Gorman Affidavit ¶34).

Gorman traveled speeds up to 100 m.p.h. in order to catch up to the gold Oldsmobile sedan.  Brown stopped at mile marker 241, the Wibaux exit, three miles from the location where Gorman radared him at mile marker 238. (Court's Doc. No. 43:  Defendant's Facts ¶35, citing Court's Doc. No. 42:  Gorman Affidavit ¶37).

Gorman approached the driver's window to request the required documentation of a driver's license, proof of vehicle liability insurance, and current vehicle registration from Brown.  (Court's Doc. No. 43:  Defendant's Facts ¶36, citing Court's Doc. No. 42:  Gorman Affidavit ¶38).

Gorman first knew for certain that Brown was African American when he arrived at the driver's window.  (Court's Doc. No. 43:

Defendant's Facts ¶37, citing Court's Doc. No. 42:  Gorman Affidavit

¶39).  Gorman informed Brown that he locked him in at 87 m.p.h.

Brown responded, "87? Oh, God!"  (Court's Doc. No. 43:  Defendant's

Facts ¶38, citing Court's Doc. No. 42:  Gorman Affidavit ¶ 40).

Pursuant to Montana Code Annotated § 61-8-303(1)(a), Gorman issued

Brown a Notice to Appear and Complaint, Citation Number 510

A031320, for speeding, traveling 87 m.p.h. in a 75 m.p.h. zone. (Court's

Doc. No. 43:  Defendant's Facts ¶39, citing Court's Doc. No. 42:

Gorman Affidavit ¶ 41; Court's Doc. No. 9-1: Exhibit A–citation).

Because Brown kept insisting to Gorman that he was not

speeding, Gorman invited Brown to look at the locked-in speed on his

radar unit.  Brown came back to Gorman's patrol car and saw that the

locked-in speed on the radar unit was 87 m.p.h.  (Court's Doc. No. 43:

Defendant's Facts ¶40, citing Court's Doc. No. 42:  Gorman Affidavit

¶42; Court's Doc. No. 43-1, p.  11: Brown Depo. depo. page 36:1-5).

Gorman did not make any race-related comment when he made

the stop.  (Court's Doc. No. 43:  Defendant's Facts ¶41, citing Court's

Doc. No. 42:  Gorman Affidavit ¶43).

The traffic violation stop for speeding on April 22, 2006, was the first and only time Gorman stopped Brown, and it was the first and only time Gorman ticketed Brown.  (Court's Doc. No. 43:  Defendant's Facts ¶44, citing Court's Doc. No. 42:  Gorman Affidavit ¶44; Brown Depo, depo page 48:9-13).

Brown cannot provide any names, addresses, or any identifying information to support his assertion that white motorists traveling at speeds in excess of the speed limit were not stopped by Gorman on April 22, 2006. (Court's Doc. No. 43: Defendant's Facts ¶46, citing Court's Doc. No. 43-1, pp. 17-18:  Brown Depo, depo page 45:16-25 - 46:1-25).

Gorman stopped one other vehicle on April 22, 2006, at approximately 2:45 p.m., and issued the driver of that vehicle, Mr. John Michael Kacewicz, who was white, a speeding citation for traveling on I-94 at a speed of 84 m.p.h., when the posted limit was 75 m.p.h. (Court's Doc. No. 43:  Defendant's Facts ¶49, citing Court's Doc. No. 42: Gorman Affidavit ¶46).

On October 25, 2006, in the Justice Court, in and for the County

of Wibaux, a trial was held in the matter of State of Montana v. Robert Brown, Cause No. 3675 regarding the speeding citation Gorman issued to Brown on April 22, 2006, Citation No. 510 AO31320.  Justice of the Peace Bill Franks presided over the trial.  (Court's Doc. No. 43: Defendant's Facts ¶50, citing Court's Doc. No. 42:  Gorman Affidavit ¶47).  Judge Franks found Brown guilty of speeding, a misdemeanor, in violation of Mont. Code Ann. § 61-8-303(1)(a).  (Court's Doc. No. 43: Defendant's Facts ¶51, citing Court's Doc. No. 42:  Gorman Affidavit ¶48; Court's Doc. No. 9-2: Sentence and Order, page 1).  Brown appealed the speeding conviction to the state district court.  (Court's Doc. No. 43:  Defendant's Facts ¶52, citing Court's Doc. No. 9-4: Notice of Appeal, pp. 1-3).  Brown's appeal was dismissed by the state district court on January 16, 2007.  (Court's Doc. No. 9-5, Exhibit E:  Order dismissing appeal, pages 1-3).

III.  ANALYSIS

As the Court has already determined, any allegation that Brown was unconstitutionally convicted or sentenced, is barred by the doctrine set forth in Heck v. Humphrey, 512 U.S. 477, 486-87 (1994).  But as set

forth in the Court's prior Order, the Court has read Brown's allegation as an equal protection claim.

The Equal Protection Clause of the Fourteenth Amendment of United States Constitution protects individuals against certain types of discrimination.  "The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race." Washington v. Davis, 426 U.S. 229, 239 (1976).  A claim under 42 U.S.C. § 1983 for violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution requires a showing of purposeful discrimination. See e.g., Crawford-El v. Britton, 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998).

> To state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class.

Barren v. Harrington, 152 F.3d 1193, 1194 (9th Cir. 1998) (citing Washington v. Davis, 426 U.S. at 239-40).

Brown produced no evidence of racially discriminatory intent or

motive.  Bingham v. City of Manhattan Beach, 341 F.3d 939, 948-49 (9th Cir. 2003) (in order to avoid summary judgment on an equal protection claim, an arrestee "must produce evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that the decision was racially motivated" (internal punctuation and citation omitted)).

This case is also quite similar to Bingham.  In Bingham, the plaintiff alleged he had been pulled over without probable cause by a white officer on the basis of race.  Bingham argued the following four facts were sufficient circumstantial evidence to give rise to a question of material fact as to whether he was stopped for discriminatory reasons: (1) the officer was white and he is black; (2) the officer was able to see his race before he pulled him over; (3) the City where he was arrested was predominantly white; and (4) although he was allegedly pulled over for erratic driving, the officer never issued a citation for that behavior.  Bingham, 341 F.3d at 948.  The district court granted summary judgment to the officer finding the record was devoid of any evidence that race motivated the stop.  The Ninth Circuit affirmed.

Brown has produced less circumstantial evidence than in Bingham.  Brown does contend that Gorman is white and he is black, that Gorman was able to see his race before he was pulled over, and that Wibaux is a predominantly white community.  But beyond that, Brown produced no evidence of racially discriminatory intent or motive.

As Brown's speeding conviction has not been overturned or declared invalid in any way, the Court must presume the validity of that conviction.  Therefore, Gorman was justified in issuing the speeding ticket.  Brown argues Gorman testified falsely at the speeding trial that Brown filed an administrative complaint against him and that Brown "hated cops."  Regardless, any such testimony, even if false, does not establish a racial discriminatory intent or motive especially with regard to the initial speeding stop.  See Liberal v. Estrada, 2008 WL 15542 **12-13 (N.D. Cal. 2008) (granting summary judgment where there was no evidence that the plaintiff was stopped because he was African American).  Like in Liberal v. Estrada, Brown has not connected any of his claims of invidious discrimination in the community to his traffic stop.  There is no evidence from which a jury

could find that Brown was stopped for any reason other than that he was speeding.

While a few other cars were on the road at the same time Brown was pulled over for speeding, Brown produced no evidence that any of these vehicles were exceeding the speed limit by over 10 miles per hour, as was he.  Moreover, Brown specifically testified he could not identify the race of the occupants of these vehicles.

Finally, the Court has considered the dash camera video and audio taken of the speeding stop.  In that video, Officer Gorman acted in a professional and respectful to Brown.  Gorman appeared to be doing Brown a favor by allowing him to choose between taking a speeding ticket or a ticket for failure to provide proof of insurance.  Presumably, Gorman could have cited Brown for both violations and yet he gave Brown a simple warning regarding the lack of proof of insurance.  There is nothing on this video to indicate racial animus or discriminatory intent.

## IV.  CONCLUSION

Brown's claims against Defendant Gorman are insufficient to

survive summary judgment.  Brown has, as a matter of law, failed to produce sufficient evidence to prove his equal protection claim.  As such, the Court will certify that any appeal of this matter would not be taken in good faith.

Based on the foregoing, the Court issues the following:

### RECOMMENDATION

1.  Defendant Gorman's Motion for Summary Judgment (Court's Doc. No. 38) should be GRANTED.

2.  The Clerk of Court should be directed to enter judgment in favor of Defendant Gorman and close this case.

3  The Clerk of Court should be directed to have the docket reflect that the Court certifies pursuant to Rule 24(a)(3)(A) of the Federal Rules of Appellate Procedure that any appeal of this decision would not be taken in good faith.  Brown failed to produce sufficient evidence to support his claims and as such no reasonable person could suppose that an appeal would have merit.

### NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Pursuant to 28 U.S.C. § 636(b)(1), Brown may serve and file

written objections to this Findings and Recommendation within ten (10) business days of the date entered as indicated on the Notice of Electronic Filing.  Any such filing should be captioned "Objections to Magistrate Judge's Findings and Recommendation."

A district judge will make a de novo determination of those portions of the Findings and Recommendation to which objection is made.  The district judge may accept, reject, or modify, in whole or in part, the Findings and Recommendation.  Failure to timely file written objections may bar a de novo determination by the district judge and may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

This is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Fed. R. App. P. 4(a)(1), should not be filed until entry of the District Court's final judgment.

DATED this 3rd day of November, 2009.

/s/ Carolyn S. Ostby
Carolyn S. Ostby
United States Magistrate Judge